[Cite as *State v. Ramsey*, 2014-Ohio-4881.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# PORTAGE COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2013-P-0101** |
| DWAYNE C. RAMSEY, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Portage County Court of Common Pleas, Case No. 2013 CR 0356.

Judgment: Affirmed.

*Victor V. Vigluicci*, Portage County Prosecutor, and *Kristina Drnjevich*, Assistant Prosecutor, 241 South Chestnut Street, Ravenna, OH 44266 (For Plaintiff-Appellee).

*Shubhra N. Agarwal*, 3766 Fishcreek Road, Suite #289, Stow, OH 44224-4379 (For Defendant-Appellant).

THOMAS R. WRIGHT, J.

{¶1} This appeal is from the Portage County Court of Common Pleas. Appellant Dwayne C. Ramsey was found guilty of aggravated robbery, a first degree felony in violation of R.C. 2911.01(B)(1); failure to comply with order or signal of a police officer, a third degree felony, in violation of R.C. 2921.331; and assault on a peace officer a fourth degree in violation of R.C. 2903.13. The trial court sentenced Ramsey to 10 years for the aggravated robbery, a consecutive sentence of 30 months for the failure to comply offense and one year for the assault, which was to be served

concurrent with his aggravated robbery offense.  On appeal, Ramsey alleges that all of his convictions were against the manifest weight of the evidence.  For the following reasons, we affirm.

{¶2}    At 10:00-10:30 p.m., on June 5, 2013, Patrolman Steven Gyoker spotted a Lincoln Towncar driving without its headlights on.  Eventually, the Lincoln Towncar turned on its headlights and passed Gyoker's patrol car.  Gyoker however noticed that there was no visible back license plate and the vehicle only had one working taillight.  Accordingly, Gyoker decided to initiate a traffic stop and turned on his overhead lights.  Instead of stopping, the Lincoln Towncar drove onto an entrance ramp on the I-76 westbound.  Gyoker pursued the vehicle.

{¶3}    During the chase, Gyoker testified that the car was weaving in and out of traffic and nearly crashed into a gas tanker.  According to Gyoker, the Lincoln Towncar's speed ranged from 70-110 m.p.h.  Eventually, as the Lincoln Towncar was exiting the highway to an Akron neighborhood, Gyoker's supervisor ordered Gyoker to stop his pursuit.  However, as that order was given, Gyoker saw the driver, later identified as Ramsey, and another passenger bail from the vehicle.  Gyoker informed dispatch that he was going to chase the driver.

{¶4}    As Gyoker chased Ramsey, he yelled, "Police. Stop."  Ramsey, according to Gyoker, did not comply.  During the chase, Gyoker testified that he had his gun unholstered because he did not know if Ramsey was armed.  However, upon catching up to Ramsey, as Ramsey was attempting to climb a fence, Gyoker holstered his firearm.  Gyoker then warned Ramsey that if he does not comply with Gyoker's orders, Gyoker will tase him.  Ramsey then, according to Gyoker, attempted to knock the taser out of Gyoker's hand and run past him.  Ramsey, however, was unsuccessful in

2

disarming Gyoker and Gyoker tased Ramsey in the back. Ramsey fell down, but was not incapacitated by the taser. Gyoker testified that he suspected the taser was only partially effective because the taser probes did not pierce his skin. According to Gyoker, if the taser probes do not make contact with the skin, the taser is ineffective.

{¶5} Thereafter, Ramsey attempted to get up off the ground and was still not complying with Gyoker's order to stop. Accordingly, Gyoker deployed a second taser cartridge; however, this did not have an effect on Ramsey. Ramsey then barrel rolled underneath a nearby SUV and stated, "OK. OK. I'm coming out." Gyoker told Ramsey to roll to the side of the truck where Gyoker was located; however, Ramsey rose on the opposite side of the truck. Gyoker walked over to the opposite side of the truck and ordered Ramsey to get down, but Ramsey would not comply. At this point, Gyoker attempted to drive stun[1] Ramsey; however, Ramsey knocked the taser out of Gyoker's hand. Gyoker then attempted to push Ramsey to the ground by placing his hands on Ramsey's shoulders.

{¶6} As Gyoker was pushing Ramsey to the ground, Gyoker felt punches going into his chest and noticed that his belt is being pulled up. Gyoker then noticed that Ramsey's hand was on his firearm. Accordingly, Gyoker turned his firearm side away from Ramsey and continued to try and push him to the ground. Eventually, Gyoker used pepper spray to get Ramsey to comply with Gyoker's orders. The pepper spray was effective in getting Ramsey down to the ground; however, this led to Gyoker and Ramsey wrestling on the ground.

{¶7} At some point during the encounter, a passerby in the neighborhood saw the altercation between Ramsey and Gyoker. Gyoker noticed the passerby, identified

---

1. A "drive stun" is where an officer causes the taser to directly contact the suspect causing pain.

3

himself and told the passerby to call 911. The passerby complied and Akron police eventually arrived and helped handcuff Ramsey. When the police asked Ramsey for his name or why he ran, Ramsey did not provide any answers. Later on, Ramsey needed an EKG connected to him because he was complaining of chest pain. Once it was determined that Ramsey did not need urgent medical care, Gyoker transported Ramsey back to the Brimfield Police Department. Gyoker testified that when he had the chance to look at Ramsey, he suspected that Ramsey was under the influence of narcotics due to his erratic behavior.

{¶8} Gyoker further testified that his firearm was operable, that he fired it before the night of June 5 and it worked, and that the gun was loaded with a bullet in the chamber on June 5. Additionally, Gyoker testified that being tased does not impair one's senses. The effects of being tased, Gyoker testified, lasts for five seconds giving the police officers enough time to handcuff a suspect. Gyoker testified that he had tased people in the line of duty three times, including Ramsey. Finally, Gyoker testified that Ramsey never indicated that he was thankful that Gyoker was there.

{¶9} On cross-examination, Gyoker testified that he talked to the prosecution about his testimony once before testifying. Gyoker testified that there were two people in the Lincoln Towncar and that the person in the passenger seat kept looking back at Gyoker during the chase. Gyoker testified that he did not know what was going on inside of the Lincoln Towncar during the chase and that the Lincoln Towncar was not driving at a constant speed. Gyoker testified that a high-speed chase did not get "the blood-flowing" because of his police training. Gyoker denied that his adrenaline was pumping during the chase. Gyoker acknowledged that it is a bit scary driving 100 miles per hour on the highways, but denied that he was scared during the chase.

{¶10} Gyoker testified that when Ramsey and the passenger bailed from the car, Gyoker chased after Ramsey because he was the driver, and therefore was the individual that was breaking the law. When Gyoker caught up with Ramsey, Gyoker testified that Ramsey was in the process of climbing a fence and had both hands on the fence. Gyoker testified that when he tased Ramsey, he had not yet been physically attacked by Ramsey. Gyoker also testified that he never said, "If you stop resisting I will stop tasing you." Gyoker denied that Ramsey was trying to prevent Gyoker from throwing him down to the ground rather than grabbing Gyoker's firearm. Gyoker also testified that he did not know which of Ramsey's hands grabbed his firearm. Gyoker further testified that he did not know whether inhaling pepper spray would cause burning in the lungs of throat. Gyoker testified that Ramsey's complaints about chest problems did not occur until after he was pepper sprayed. Gyoker also testified that it was not unusual that Ramsey would have pain in his chest and that someone can have pain in their chest without having a heart attack.

{¶11} On re-direct, Gyoker testified that he only used the pepper spray after Ramsey reached for his gun.

{¶12} On re-cross, Gyoker testified that he could not know if Ramsey was purposefully reaching for his firearm.

{¶13} William Atha, a patrolman for the Brimfield Police Department, testified next. Atha testified that when Gyoker and Ramsey arrived at the police station, Ramsey was refusing to get out of the car. According to Atha, Ramsey was complaining of chest pain, and had to be dragged out of the car. Once Ramsey was out of the car, he refused to walk, and was physically carried to the detention unit. Atha testified that once Ramsey was in a holding cell, Ramsey complained of chest

5

pains, and refused to answer basic questions, such as what his name was. Ramsey also complained that his handcuffs were too tight. Eventually, Atha took Ramsey to a hospital because of the chest complaints. At the hospital, Atha informed Ramsey that the police wanted a blood and urine sample; however Ramsey indicated that he would not consent to giving a sample. Therefore, no samples were obtained.

{¶14} On cross-examination, Atha testified that for most of the time Ramsey was with him, Ramsey was incoherent.

{¶15} Sergeant Matthew McCarthy for the Brimfield Police Department testified next. McCarthy was the shift supervisor that oversaw the chase of Ramsey's vehicle on I-76. He testified that he made the decision to terminate the chase because of traffic in the area and because Gyoker had no other assistance. McCarthy also indicated that during the search of the Lincoln Towncar, the police found a clear cylindrical item with a white substance in it. McCarthy identified that item as a crack pipe. McCarthy also indicated that the police found a hard drive with an anti-theft security device attached during the search. Finally McCarthy testified that Ramsey would not answer any of the police's questions.

{¶16} On cross-examination, McCarthy testified that Ramsey was not charged with a drug offense. He also testified that Ramsey appeared in distress, and he was not sure whether Ramsey was faking his distress.

{¶17} David Oliver, the Chief of Police for the Brimfield Township Police Department also testified. Oliver testified that Gyoker was a patrol officer in the Brimfield police department and that Gyoker was issued a firearm. Oliver testified that his department does not issue anything less than a "Level 2" holster. A Level 2 holster requires a strap to be unsnapped and for the weapon to be twisted in a particular

6

manner in order to unholster the weapon. Oliver also testified about the Brimfield Police Department's use of force continuum. Specifically, Oliver testified that first an officer should try to talk to someone or yell a command to de-escalate a situation. If talking or issuing a command does not work, an officer should use non-lethal force, such as a taser or pepper spray. If a situation becomes lethal, then an officer can use his or her firearm. Oliver testified that there is no unwritten rule that if a suspect runs from the police, the police will harm the suspect. He also testified that pepper spray and tasers are not provided to torture a suspect. Oliver further testified that he received no complaints concerning the use of excessive force by Gyoker. Finally, Oliver testified that a car chase will be terminated if (1) over the long-term excessive high speeds are reported, (2) there is a lot of traffic nearby the cars or (3) the officer somehow ends up by himself.

{¶18} On cross-examination, Oliver testified that he did not think it was scary or nerve-wracking to be involved in a high-speed chase, and that it was not scary to confront a suspect at night in a strange city. He further testified that his adrenaline does not "get pumped" during a chase. Oliver testified that he has seen officers get excited to catch a bad guy, but he has not needed to tell an officer to settle down.

{¶19} Oliver testified that being tased and subjected to pepper spray was painful. He further testified that he was not present for the events that happened in Akron. Oliver testified that he did not take a statement from Ramsey because Ramsey would not speak to the police. Oliver testified that the police department has the capability of videotaping interviews with suspects and that Oliver personally did not try to interview Ramsey. Oliver further testified that he took Gyoker's statement of events for the night of June 5, and that he believed Gyoker because his story was

7

corroborated by the dash cam video.  Oliver admitted that there was no corroboration of the events that took place in Akron.  Finally, Oliver testified that he would not talk to a suspect and violate his rights, and that he would wait for the suspect to voluntarily talk to him.

{¶20} On re-direct, Oliver testified that Ramsey was entirely uncooperative with the police officers and that he did not provide the police with any version of events. Oliver testified that once a suspect is placed in jail he is appointed a lawyer and Oliver cannot talk to the suspect without going through his lawyer.  Oliver testified that Ramsey's counsel never requested to speak with the police department.

{¶21} On re-cross, Ramsey produced a Portage County Sheriff's Grievance reply form dated June 10, 2013, purportedly written by Ramsey, which stated that Ramsey wanted to talk to someone about his arrest but that no one had talked to him yet.[2]  Oliver testified that he had never seen this document before.

{¶22} On re-direct, Oliver testified that because Ramsey's purported grievance was made five days after the incident in question, Ramsey would have had an attorney appointed.  Therefore, in order to speak to Ramsey, Oliver would have needed to contact Ramsey's attorney.  However, no attorney representing Ramsey ever contacted Oliver.

{¶23} Finally, Ramsey testified in his own defense.  Ramsey testified that on the night of the incident, Ramsey was wearing a long-sleeve shirt with a white "wifebeater" undershirt.  Ramsey denied that he was wearing several layers of clothes.  According to Ramsey, the passenger who was in the car with him was named Terry.  Ramsey met

---

2.  The document was used solely for impeachment purposes, not as substantive evidence.

8

Terry that day through a mutual acquaintance and the three of them watched movies together.

{¶24} Ramsey's testimony then jumps in time to where Ramsey was napping in the passenger seat of his car in a Wal-Mart parking lot. At some point, Terry approached the car and told Ramsey, "Get the fuck over." Ramsey then moved over to the driver's seat and asked Terry where they were going. According to Ramsey, he refused to go anywhere, because he wanted an explanation from Terry as to how he got here. Terry replied, "I drove us here [while] you [were] out. I drove us here because I kept asking you to take me somewhere. I had to meet somebody and had something to do. Ramsey testified that Terry then hit him on the shoulder and said, "Let's go." Ramsey testified that he then "grabbed back" at Terry for being too physical. Terry then, according to Ramsey, brandished a .38 snub nose firearm, which was black and had a brown handle. Terry repeated his command, "Let's go," and Ramsey drove the car out of the parking lot.

{¶25} Ramsey testified that his headlights were off as he was leaving the parking lot because the area was well-lit and because he was too busy watching the gun pointed at him. At some point, Terry saw Gyoker in his police cruiser and told Ramsey not to stop if Gyoker gets behind him or else Terry will shoot him. Eventually Gyoker got behind Ramsey's car and Terry, according to Ramsey, reiterated his threat. Later, Terry instructed Ramsey to get on the highway because "they were going back to Akron." Ramsey then slammed on the gas because Terry told him to. At this point, Ramsey feared for his life.

{¶26} Later on, Terry instructed Ramsey to get off the highway near Akron. Ramsey testified that he was semi-familiar with the area where they exited. On the exit

9

ramp, Ramsey testified that when he slowed down, Terry tried to bail out of the car. Therefore, Ramsey sped up to prevent Terry from escaping. Eventually, Ramsey jumped a curb, causing Terry to bounce up, thereby creating an opportunity to escape from Terry. According to Ramsey, Terry threatened to shoot him as he was leaving the car, but nevertheless Ramsey continued to run.

{¶27} At some point, Ramsey reached an area in a neighbor's yard where his foot got caught in a hole. Shortly thereafter, Ramsey heard the command, "Get down! Freeze!" According to Ramsey, he responded, "Okay Officer. All right. Yes sir. Yes sir, officer, but my foot is stuck in a hole; can I take it out?" Ramsey then put his hands up, and, according to Ramsey, was tased in the back. Ramsey testified that although a fence was nearby, he was nowhere near the fence when he was tased. Ramsey testified that he was thrown to the ground from the taser. As Ramsey tried to get up, he testified that he was tased again. According to Ramsey, he asked the officer, "Why are you doing this?"

{¶28} Somehow, Ramsey was capable of rolling under an SUV that was nearby, thereby causing the taser cords to beak. Ramsey then announced that he was going to come out again on the other side of the car. According to Ramsey, Gyoker, walked around the car and tased him in the back. Ramsey asked Gyoker to stop; however, Gyoker responded by spraying pepper spray in his face. According to Ramsey, the pepper spray went into his nose and mouth and he started feeling pain in his chest. Ramsey testified that he never tried to punch or kick Gyoker, or put his hand on Gyoker's gun. Ramsey further testified that after being sprayed with the mace, he was in distress and no one tried to get his side of the story. Ramsey also testified that he

10

had no ill will toward Gyoker because Ramsey believed Gyoker saved his life from Terry. Finally, Ramsey testified that he had a prior conviction for robbery.

{¶29} On cross-examination, Ramsey acknowledged that he was the driver of the car, that only he and Terry were in the vehicle, and that there was a hard drive with an attached anti-theft security mechanism as well as a crack pipe in the car. Ramsey also acknowledged there was traffic on the highway. Ramsey further testified that he only saw his speedometer hit 80 miles per hour, and Terry wanted him to go faster. Ramsey admitted that he had to avoid hitting a gas tanker while he was speeding.

{¶30} Additionally, Ramsey testified that he did not let Terry escape initially because Ramsey wanted to keep Terry in the car so Ramsey would have corroboration for his story. Ramsey testified that he did not see a contradiction with his duress defense to the failure to comply with order or signal of police officer offense and his attempts to keep Terry in the car for corroboration purposes. Ramsey further testified that he did not know Terry's last name. Ramsey testified that he ran from the car, as opposed to waiting for the police to arrive after Terry ran from the car, because he did not know if Terry would shoot him.

{¶31} Ramsey also admitted that he had prior convictions for crack possession and selling crack, and two prior falsification convictions. Ramsey testified that he only pled guilty to the falsification convictions because he wanted to avoid going to prison. Terry further testified that he did not subpoena Jackie, the woman with whom Terry and he watched movies with, because "she would not have the slightest idea about any of this." In regard to the jump of time from when he met Terry at the Wal-Mart parking lot, Ramsey testified that he believed he was carried out of his house and into the car, which Terry drove to Brimfield. Ramsey acknowledged that he was 5'11" and weighed

275 pounds. Finally, Ramsey denied that he ran from the police because he had a crack pipe in his car.

{¶32} On re-direct, Ramsey testified that he is tested for drugs regularly at his job, that this case has nothing to do with drugs, and that Terry is a real person.

{¶33} As the sole assignment of error, Ramsey asserts: "Ramsey's convictions were against the manifest weight of the evidence."

{¶34} Within this assignment, Ramsey argues that there was no evidence that Ramsey removed or attempted to remove a deadly weapon from Gyoker because (1) there was no testimony indicating that Gyoker's firearm "was capable of inflicting death and designed or specifically adapted for use as a weapon, or possessed, carried or used as a weapon," and (2) there was no testimony indicating that the firearm was capable of expelling or propelling at least one projectile, as required by R.C. 2923.11(B). In regard to the failure to comply with order of signal of a police officer offense, Ramsey argues that it was against the manifest weight of the evidence for the jury to not credit his duress defense. He also argues that the police's failure to even attempt to locate Terry damages the state's case because had the police located Terry, the police may have found Terry's gun or questioned him about Ramsey. Finally, Ramsey argues he never assaulted Gyoker and he was merely trying to comply with Gyoker's commands.

{¶35} In determining whether evidence is sufficient to sustain a conviction, the reviewing court asks whether reasonable minds could differ as to whether each material element of a crime has been proven beyond a reasonable doubt. *State v. Bridgeman*, 55 Ohio St.2d 261, 381 N.E.2d 184 (1978). If reasonable minds could differ as to whether each material element has been proven, a Crim.R. 29 motion for

acquittal must be overruled. *Id.* at 263-64. The evidence adduced at trial and all reasonable inferences must be viewed in the light most favorable to the state. *State v. Maokhamphiou*, 11th Dist. Portage No. 2006-P-0046, 2007-Ohio-1542, ¶20.

**{¶36}** In contrast, a manifest weight challenge requires the reviewing court to play the role of a "thirteenth juror." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997 Ohio 52, 678 N.E.2d 541 (1997). A reviewing court should be cognizant of the fact that the jury is in the best position to assess the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus (1967). For an appellate court to overturn a conviction as being against the manifest weight of the evidence, it must be found that "'the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins*, 78 Ohio St.3d at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 20 Ohio B. 215, 485 N.E.2d 717 (1983).

**{¶37}** R.C. 2911.01(B) defines a type of armed robbery and states in pertinent part:

**{¶38}** "No person, without privilege to do so, shall knowingly remove or attempt to remove a deadly weapon from the person of a law enforcement officer, or shall knowingly deprive or attempt to deprive a law enforcement officer of a deadly weapon, when both of the following apply:

**{¶39}** "(1) The law enforcement officer, at the time of the removal, attempted removal, deprivation, or attempted deprivation, is acting within the course and scope of the officer's duties;

13

{¶40} "(2) The offender knows or has reasonable cause to know that the law enforcement officer is a law enforcement officer."

{¶41} A deadly weapon is defined in R.C. 2923.11(A) as "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon."

{¶42} Failure to comply with order or signal of a police officer is defined in R.C. 2921.331 as, "No person shall operate a motor vehicle so as willfully to elude or flee a police officer after receiving a visible or audible signal from a police officer to bring the person's motor vehicle to a stop." This offense is elevated to a third degree felony where "[t]he operation of the motor vehicle by the offender caused a substantial risk of serious physical harm to persons or property." R.C. 2921.331(C)(5)(a)(ii).

{¶43} Assault is defined in R.C. 2903.13(A) as, "No person shall knowingly cause or attempt to cause physical harm to another or to another's unborn." When the offense is committed against a peace officer who was performing their duties, it was, at the time of the offense, a fourth degree felony. R.C. 2903.13(C)(4), Am. Sub. H.B. 62.

{¶44} Turning to appellant's arguments, it suffices to say that the state was not required to prove Gyoker's weapon met the definition of a "firearm" pursuant to R.C. 2923.11(B); rather, the state only had to show that Gyoker's firearm was a "deadly weapon." To that end, Gyoker testified that his gun worked on the night in question and that it was loaded. No contradictory evidence to the contrary was introduced. Therefore, this is not a reason for setting aside the jury's verdict.

{¶45} Furthermore, the remainder of Ramsey's manifest weight and sufficiency arguments require the fact finder to credit Ramsey's testimony or not credit the state's evidence. However, nothing indicates that the jury lost its way in crediting the state's

14

evidence. Therefore, we find there was sufficient evidence for all offenses and that the verdict was not against the manifest weight of the evidence.

{¶46} The sole assignment of error is without merit.

{¶47} The judgment of the trial court is affirmed.


TIMOTHY P. CANNON, P.J.,

CYNTHIA WESTCOTT RICE, J.,

concur.